UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PREMIER DEALER SERVICES, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 12-1498** |
| | **c/w   12-2790** |
| **TROY DUHON, ET AL.** | **SECTION: "H" (4)** |

**ORDER**

      Before the Court is Defendants, Troy Duhon, ("Duhon") and Premier Automotive Products, LLC's, ("Premier Automotive") (collectively, "Defendants") **Motion to Compel Production and for Sanctions based on Spoliation of Evidence (R. Doc. 101),** seeking an order from this Court imposing sanctions on Third-Party Defendant, Dealer Services South, ("DSS") for responding to discovery requests inadequately, for failing to produce relevant documents referenced during the deposition of DSS's Chief Executive Officer, ("CEO") Marc Mader ("Mader"), and for the alleged destruction of an iPad and original e-signature of Administrative Agreements which is the subject of this action. (R. Doc. 101).[1] The motion was opposed. (R. Doc. 108). Defendants filed a reply to the opposition in early September, as well as a supplemental memorandum in support of its motion for sanctions on October 29, 2013. (R. Docs. 119, 145).

---

[1] The underlying Motion to Compel Production and for Sanctions based on Spoliation of Evidence (R. Doc. 101), was taken under submission on September 4, 2013. On October 17, 2013, this Court ruled on the Motion to Compel, reserving its ruling on the Motion for Sanctions. *See* R. Doc. 141. Therefore, this Order pertains only to the sanctions issue.

I.      **Background**

This action arises out of the alleged trademark infringement of Plaintiff, Premier Dealer Services, Inc.'s ("PDS") customer loyalty programs and other products for interstate automobile dealers, by Defendant, Premier Automotive. (R. Doc. 1, p. 5). Premier Dealer alleges that Defendants, which included Troy Duhon and Premier Automotive[2] were contacted in 2010 by Premier Dealer's agent, now third-party defendant, DSS, through its CEO, Mader, who also marketed PDS' automotive warranty. ("DSS"). *Id.* at 7.

PDS alleges that defendants showed interest in the Plans, received training, and confidential information from PDS. *Id.* at ¶23-26. On September 20, 2011, PDS alleges that through its agent, DSS, it entered into into "Administration Agreements" with each of the Defendants. *Id.* at 8. These Agreements which totaled eight in number were allegedly signed by Scott Nietert acting for the defendants and required Defendants to participate in the Lifetime Powertrain Protection and Lifetime Engine Protection plans, to arrange for insurers, process claims, and included provisions regarding the use of PDS' intellectual property and proprietary information. *See id.*

PDS alleges that it subsequently learned that Defendants had copied its marketing and administrative materials, in contravention of the Administration Agreements. *See id.* at 9. PDS alleges that defendants breached the Agreements and infringed its copyright in a legal form entitled "Lifetime Powertrain Program Certificate." *Id.* at ¶34-43. PDS alleges that Defendants' true intention was not to enter into a business relationship with it, but rather to gain access to its materials, training expertise, and trade secrets. *Id.* at 10. Premier Automotive brought a third-party demand against agent DSS, alleging that (1) DSS voluntarily shared PDS's materials and (2) allegedly PDS was never a party to the agreement.

---

[2]Premier Dealer also sued Scott Neitert, ("Nietert") Wayne Skinnard, ("Skinnard") Premier Nissan of Fremont

On October 17, 2013, this Court ruled separately on Defendants' Motion to Compel Production. *See* R. Doc. 141. In its Order, the Court reserved its ruling on Defendants' Motion for Sanctions and ordered Defendants to produce the Notice of Deposition of Marc Mader, as well as any and all documents referenced as exhibits, whether or not attached, in his July 22, 2013, deposition. *Id*. at p. 10-11. The Court also ordered that to "the degree the October 1, 2013, Court Ordered Extended Deposition of Marc Mader (R. Doc. 120) adds to the merits of the Motion for Sanctions" Defendants were to produce the testimony to the Court along with the Notice of Deposition. *Id.*

As to the instant Motion, Defendants argue that DSS failed to comply with its discovery requests and move this Court to compel DSS's responses and impose sanctions based on spoliation of evidence, (1) for its failure to produce relevant documents referenced during the deposition of DSS's Chief Executive Officer, ("CEO") Marc Mader ("Mader"), and (2) for the alleged destruction of the iPad containing the original e-signature of Premier Automotive's employee, Scott Nietert who allegedly signed the agreements with Defendants and (3) the original e-signature. *Id.*

## II. Standard of Review

Allegations of spoliation, including the destruction of evidence in pending or reasonably anticipated litigation are reviewable in federal courts today through the inherent power to regulate the litgation process occurs before a case is filed or if for another reason, there is no statute or rule that adequately addresses the conduct. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 46, 50-51 (1991); *InrePraxada,* at *5; *Methode Electronics, Inc. v. Adam Technologies, Inc.,* 371 F.3d 923, 927 (7th Cir. 2004) (district courts have inherent power to impose sanctions for abuse of the judicial system). *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 611 (S.D. Tex. 2010).

If an applicable statute or rule can adequately sanction the conduct, that statute or rule should ordinarily be applied with its attendant limits rather than a more flexible or expansive "inherent power."

*Chambers,* 501 U.S. 50. A trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance. *Natural Gas Pipeline co. of Am. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1408 ( 5th Cir. 1998)

When inherent power does apply, it is "interpreted narrowly, and its reach is limited by its ultimate source– the courts need to orderly and expediously perform its duties." *Newby v. Enron Corp.,* 302 F.3rd 295, 302 (5th Cir. 2002)(footnote omitted). If inherent power, rather than a specific rule or statute, provides the source of the sanctioning authority under *Chambers*, it may be limited to a degree of culpability greater than negligence. *Rimkus Consulting Group, Inc.* 658 F. Supp.2d 598 (S.D. Tex. 2010).

Rule 37(b)(2(A) applies when a party, officer, director, or managing agent or witness designated under Rule 30(b)(6) or 31(a)(4) fails to obey an order to provide or permit discovery including an order under 26(f), 35 or 37(a). In these instances the Court may issue orders that (1) designate facts as established, (2) prohibit the disobedient party from supporting or opposing the claim, defense from introducing evidence, (3) strike pleadings in whole or part, (4) stay the proceedings until the order is obeyed, (5) dismiss the action in whole or part (6) render a default judgment against the disobedient party and/or (7) treat as contempt of court for the failure to obey any order except an order to submit to a physical or mental examination. *See* Fed. Rule Civ. 37(d)(1)(A).

In addition, a Court has statutory authority to impose costs, expenses and attorneys fees on "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Rule 37(e) also applies to electronically stored information lost through "routine good-faith operation of an electronic information system rather than through intentional acts intended to make evidence unavailable in litigation." *Id.*

**III.     Analysis**

    **A.     Authority for Sanctions**

Defendants contend that the Court should sanction DSS because it intentionally deleted all relevant emails even though it knew that litigation is imminent. It does not indicate the authority by which the Court can assess a finding of sanctions.

DSS in contrast contends that Defendants' Motion is untimely or premature. It suggests that the appropriate method for obtaining sanctions is that Plaintiff should first move to compel the production of electronic data, then upon the opposing party's failure to do so, seek sanctions. *See* R. Doc. 108, p. 5-6; citing *Marketfare Annunciation, LLC., v. United Fire & Cas. Ins. Co.,* 06-07232, 2007 WL 3273440, at * 4 (E.D. La. 11/5/07).

As described above, the spoliation alleged in this case and the proposed sanctions implicate this Court's inherent authority. The record indicates that the state court suit that was initiated by DSS was withdrawn or voluntarily dismissed on May 21, 2012. Less than one month later PDS filed the subject lawsuit for which Mader confirmed he knew PDS intended to file, during his deposition. However in the time between the dismissal of the state suit and the subject suit, according to Mader, three forms of electronic evidence were discarded.

As a result, the alleged spoliation occurred before the subject matter was filed, before a discovery order was entered, and before a Rule 37 motion for the failure to comply with discovery orders. In instances such as this, the Court's inherent authority provides the legal basis for considering the subject motion. As a result, the courts authority to sanction is limited to a finding of bad faith. *See Sample v. Miles*, 239 Fed. App'x 14, 21 n. 20 (5th Cir. 2007).

    **B.     DSS' Obligation to Preserve**

Defendants argue that Mader had a duty to preserve the email subfolder, the iPad containing the e-signature used on the Administration Agreements central to this dispute, and the original e-signature, because he "knew" litigation was imminent. *See* R. Doc. 101-6, p. 85, *Mader Depo 1,* ("MD1") pp. 338-39.

In opposition, DSS contends that Mader did not have a duty to preserve the evidence as he could not have "reasonably anticipated" that he would need it for future litigation. *See* R. Doc. 108, p. 5-6; R. Doc. 148-1, pp. 186-87.

A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation. *Rimkus*, 688 F.Supp.2d at 612 (citing *John B. v. Goetz,* 531 F.3d 448, 459 (6th Cir.2008)); accord, *Toth v. Calcasieu Parish*, 2009 WL 528245 at *1 (W.D.La. 2009) (citing *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y.2003)). Once litigation is reasonably anticipated, a potential party to that litigation has a duty not to destroy "unique, relevant evidence that might be useful to an adversary." *Toth*, 2009 WL 528245 at *1; quoting *Zubulake*, at 216.

While DSS alleges that it did not know that Mader needed to preserve the electronic evidence consisting of his and Mark May's emails relating to the administration agreements, or the electronic document containing the e-signature of Nietert and the devices consisting of his iPad and desktop, the Court finds this contention disingenuous. Mader testified that he dismissed his suit which sought to cover his training expenses, including advancing costs for three of Defendants' employees to travel to Ohio for training, and the cost of mailing the marketing material that was allegedly copied by the Defendants. *See* R. Doc. 1-2, p. 14.

DSS also alleged in the state complaint that the Defendants agreed to purchase the warranty product, and that it was mislead by the representations of the Defendants. It does not allege however, that there were executed agreements. Instead the state complaint alleges that the defendants violated the

6

Louisiana Unfair Trade Practices Act, seeking compensatory damages due to loss profits, attorneys fees and costs.

Mader, DSS's CEO testified that he dismissed his state lawsuit so that PDS could file its own suit in federal court, on June 12, 2012. *See* R. Doc. 101-6, p. 17-18, MD1 pp. 67-68, 72, 339; *see also* R. Doc. 148-1, p.18-19, *Mader Depo 2,* ("MD2") pp. 18-19. Therefore, he had knowledge that litigation arising out of the Lifetime Powertrain Protection and Lifetime Engine Protection Plans was anticipated, as these issues are also the subject of this suit. *Id. See e.g., InrePraxada,* 2013 WL 5377164 (the duty to preserve arises when a party knew or should have known that litigation was imminent, not only when it is reasonably foreseeable). As such, the Court finds that DSS had a duty to preserve evidence.

### C.     DSS' Culpability

PDS contends that DSS intentionally destroyed emails and other evidence because they knew that litigation was imminent. *See* R. Doc. 101-2, p. 2. PDS contends that Mader, through his testimony exhibited the intent to destroy evidence when he allegedly donated the iPad containing the only original copies of Nietert's signature to "iPad heaven" and then donated the desktop computer that had electronic copies of the files containing Nietert's signature to his employees. *See* R. Doc. 101-2, p. 12. PDS contends that Mader's testimony confirms that he destroyed the computer and nearly all of the electronic information that is critical to the defendants' claims or defenses after the filing of this suit, such that culpability is established. *See* R. Doc. 101-2, p. 13. PDS further contends that DSS's contention that its retention of a new Email Hosting company in January 2013, did not result in the negligent loss of emails as eluded to by Mader's deposition testimony.

In opposition, DSS contends that Mader and DSS did not breach their duty because neither could have reasonably anticipated that they would be involved in future litigation. *See* R. Doc. 148-1, p. 187. DSS also contends that at the time it donated the iPad which contained the signature, it did not

7

reasonably anticipate litigation or that the iPad would be needed for subsequent litigation. It does not however address the donation of the desktop computer which contained the same electronic documents with Nietert's signature, nor does it address whether having access to the electronic copies of the Agreements, which are subject of this suit, would reasonably be necessary for PDS' subsequently filed suit.

Additionally, DSS knew that PDS would be filing suit but still permitted its employees to purge their emails citing to an informal document retention policy. It suggests further that any relevant emails would either be in the possession of Premier Auto or PDS even if it no longer had access to the information. As an additional argument, DSS contends that the emails in the subfolder may have been destroyed or they did not retain emails during the data migration of January 2013 by Teknarus, who is no longer in the email hosting business. *See* R. Doc. 108, p. 4.

In order to sanction a party for spoliation of evidence, the party who destroyed evidence must have a "culpable state of mind." *SJS Distrib.,* 2013 WL 5596010, at *3; citing *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 108 (2nd Cir. 2002). Culpability is not established by any bright line test, but rather, analyzed on a case-by-case basis. *Id.* Therefore, culpability ranges from bad faith or intentional destruction of evidence by a party, to the gross negligence of a party to preserve evidence once the party knew or should have known that litigation was imminent. *See e.g., Yelton v. PHI, Inc.,* 279 F.R.D. 377, 391 (E.D. La. 2011) (M. J. Roby).

For example, in *SJS Distribution Systems v. Sam's East, Inc.,* the plaintiff failed to preserve 169 relevant emails received by or sent to SJS personnel regarding the subject mater of the litigation and none were produced. The plaintiffs also failed to produce relevant electronic communication relating to the shipment, storage or attempted resale of the product in question and nor did the plaintiff produce internal communications or communications with third parties as requested. As a result the defendants

filed a motion for sanctions seeking to prevent the plaintiff from offering certain documentary evidence and an adverse inference jury instruction because the plaintiff caused the spoliation of relevant evidence.

The Court found that the plaintiff had an obligation to preserve the relevant records, but failed to do so. The Court further noted that the plaintiff never issued a formal litigation hold to ensure preservation of electronic information, despite admitting familiarity with its obligation to preserve documents in the event that litigation seems likely for a particular matter. The Court found that the facts established that plaintiff's failure to take the most basic document preservation steps, even after it discovered the packaging non-conformities and filed this action, constituted gross negligence which was inexcusable given that it had full knowledge of the possibility of future litigation which it actually instituted. Therefore the Court found that the plaintiff was culpable.

In contrast, in *Puerto Rico Telephone Company, Inc., v. San Juan Cable, LLC.,* the defendant failed to preserve relevant emails within its control. The court noted that the email accounts of the defendant's former officers were relevant, as these officers had used their personal email accounts to manage the company for as long as seven years. The defendant knew that its managing officers used their personal email accounts to engage in company business, and therefore its duty to preserve extended to those personal email accounts. The defendant acknowledged that it could not find three responsive email chains from its former CEO's personal email account. *P.R. Tel. Co., Inc., v. San Juan Cable, LLC.,* 2013 WL 5533711 (D. Puerto Rico Oct. 17, 2013).

The Court found that the request for sanctions was problematic on several accounts. It noted that upon notice of the lawsuit, the defendant issued a litigation hold notice to its employees, including the former officers at issue the dispute. The court also noted that the hold notice informed the officers of their duty to preserve all relevant evidence including electronic data, and the three missing email

chains were recovered through other sources and were not potentially damaging to the defendant. The Court found that there was no prejudice and thus an insufficient foundation for an adverse inference. Therefore, the Court denied the motion for sanctions without prejudice. *P.R. Tel. Co., Inc.,* 2013 WL 5533711, at *1; (*see e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 803 F.Supp.2d 469, 501 (E.D.Va. 2011) (finding spoliation in part based on deletion of relevant emails from employees' personal email accounts)).

First, Mader testified in his deposition that he created an email subfolder in May 2012 for Premier Automotive, which contained pertinent emails, when he filed his own state court lawsuit against Premier Automotive. *See* R. Doc. 101-6, p. 18-19, *citing* MD1 p. 72-74. However, Mader acknowledged that shortly after he dismissed his state suit, on May 21, 2012, he deleted the subfolder. All of the emails were deleted, even though he knew that Premier Dealer was filing suit in federal court against Defendants, which occurred only 39 days later involving substantially the same allegations i.e. that Premier Auto breached the warranty sales agreement, coopted it and used it causing PDS damages. *See* R. Doc. 101-6, p. 17-18, MD1 pp. 67-68, 72, 339; *see* R. Doc. 148-1, p.18-19, MD2 pp. 18-19.

While Mader testified during his deposition that DSS had an informal destruction policy which required its employees to delete emails every three months, the policy was clearly not followed because Mader's own testimony establishes that at the time he filed the state law suit on May 4, 2012, only 39 days had elapsed between the filing of the state suit and the subject federal lawsuit filed on June 12, 2013, yet he deleted the subfolder. Mader's testimony on this issue is creative at best, but not credible.

Further, Mader suggests that its email service provider may have lost some of the emails during its email migration. However the testimony of the corporate representative of Tecknarus, Mr. Devin Zito, contradicts Mader's belief. Zito testified that Tecknarus terminated the email hosting services of DSS in March of 2013 at which time the data was migrated to their Microsoft Office 365 hosted

exchange. *See* R. Doc. 143-7, Deposition Testimony of Tecknarus, p. 9. Zito testified that to his knowledge, they did not have any problems migrating the emails and nor does his research of the account suggest that they had any difficulty migrating the DSS emails. *Id.* at 10. Zito denied that the spam related problem that DSS was experiencing would have resulted in any loss of emails that were properly transmitted to the server it maintained. *Id.* at 11. Therefore, Mader's suggestion that the email migration caused the loss of the subfolder and other emails related to his attempt to market the warranty product is also not credible.

Mader's testimony regarding the decision to discard the iPad that purportedly contained the electronic signature is also not credible. According to Mader, the administration agreements central to this dispute were allegedly signed electronically by Scott Nietert on an iPad, using "PDF expert." *See* R. Doc. 101-6, p. 65-66, MD1, p. 260-264. However, Nietert disputes the statement of Mader and indicates that he did not sign any of the agreements. Since this allegation arose, Premier Automotive alleges in one of its pleadings that Mader, DSS' CEO and the agent of PDS, forged Nietert's signature. *See* R. Doc. 102-20. As a result, the e-signature which purportedly existed on the Mader's iPad is highly relevant to the allegations.

Mader testified that both the program and the original signature were stored on a First Generation iPad. Mader also testified that he no longer had possession of the iPad because it is in "iPad heaven" and that it was "junk." *Id.* at 67, MD1, p. 266-68. Mader testified that six months before he filed his lawsuit against Premier Automotive, he gave the old iPad to the other employees to use before donating it to "Healing Place Church." *Id.* Mader also testified that he donated the iPad in a bag of clothing and shoes, but failed to get a receipt to prove this donation. *Id.*

After Mader provided testimony that he donated the iPad, he telephoned the alleged recipient, Gered Lambert of Healing Place Church, to inquire if he remembered that Mader made such a donation.

11

Lambert confirmed after consulting with a church employee that no iPad donation was received. *See* R. Doc. 143-5, p. 7. Thereafter, Mader changed his testimony from donating the iPad to the church as a good Samaritan to an act of God caused it to turn on and off when he would let it sit in the sun. *Id.* at 15. *See* R. Doc. 148-1, p. 14. He acknowledged that his earlier testimony was not truthful but in the same breath maintained his testimony that he gave that iPad to the church or at least he thought he had done so. See R. Doc. 143-5, p. 7. It is clear that he intended to render the iPad unavailable.

Fourth, also at issue is Mader's decision to discard the desktop computer which also contained an electronic copy of the digitally signed administration agreements. *See* R. Doc. 101-2, p. 8; R. Doc. 101-6, p. 68-69. Mader testified that the computer was old, so he decided to replace it with a new one. Mader also testified that he produced the email containing the attachment of e-signed administrative agreements in connection with discovery, when the suit was filed, and that he no longer knew where these documents could be found. *Id.* at 68, MD1 p. 269-272.[3] Again, while Mader originally testified that he got rid of the computer, he recanted this testimony later in his continuing deposition and indicated that the "old computer" was now in use by his secretary, rather than discarded. *See* R. Doc. 148-1, p. 121-123.

Jeff Hanson of Computer Wizards conducted a search of the computer at Mader's instruction. However, Mader limited the search terms to "PremierAutomotive.com" and "PDSADM.com," and not "Premier Dealer Services" or "Premier Automotive." *See* R. Doc. 145-1, p. 5, 8-9. As such, Hanson

---

[3] Wolery?" Question: "Correct." Answer: "No. Yes. That only had Mr. Nietert's signature on it." Question: "And you produced [paper] copies of [the actual] PDF copies of those through the course of discovery in this case, correct? Answer: No." . . . Question: ". . . [t]he original file that was e-mailed from your iPad to the computer is gone?" Answer: "Yeah. Because that iPad, like I said, I don't know, a couple of questions back –" Question: "That iPad is gone and the computer is gone?" Answer: "Yes." Question: "So the e-mail is gone, correct?" Answer: "I don't know...[] I don't have it. [] that was three years ago." Question: "The original file that was generated by the program, PDF Expert, was on the iPad and that's gone as well, correct? Answer: Yeah. It's gone too."

stated that the search terms did not yield any responsive emails and also, the computer was not connected to iTunes. *See id.,* at 24.

Hanson also testified that the computer was "pristine, very clean" as the hard-drive had allegedly crashed and had to be completely redone. *See* R. Doc. 145-1, p. 16. He acknowledged also that when he was contacted by Mader to perform the search of the hard-drive, he was not asked to search for the program PDF Expert, which allegedly contained the original copy of e-signature, located on the missing iPad. *Id.* at 22. Because, he testifies, that he was only asked to perform a basic search, and not a forensic one, his search surprisingly yielded no responsive documents. *See id.* at 48.

Mader indicates that at the beginning of his lawsuit he provided copies of the Administration Agreements. The evidence in the record shows that a copy of the Administration Agreement is attached as an exhibit to PDS' initial complaint, and does contain the signature of what appears to be Scott Nietert. Whether the signature is forged by Mader or whether the iPad and old computer were discarded, the actual document exists which was apparently printed at some point before the electronic devices were discarded. *See* R. Doc. 1-2, Exhibit 2, 06/12/12. As a result, just as a handwriting exemplar could have been used and compared to the electronic version, it also may be applied to the printed version containing the signature. Therefore, the Court does not see how PDS is prejudiced by the discarding of the iPad or the email file containing the electronic document which existed on the old computer.

The Court therefore finds that as to the subfolder and other related emails which were discarded by DSS, the discarding constitutes spoliation and resulting prejudice to PDS. However, even though Mader spoliated the iPad and the old computer, there is no prejudice from the loss of the electronic administrative documents because a printed copy is available for the parties to review and analyze.

**E.     Remedy**

PDS does not expressly request a particular form of sanctions, and DSS does not address any actual penalties, but instead, only addresses the fact that it was not culpable. Having determined otherwise, the Court will now consider the appropriate sanction for discarding the emails and the subfolder.

It is well settled that courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party. *Hunt v. Marquette Transp. Co., Gulf-Island, LLC,* 2011 WL 3924926, at 1-3 (E.D.La. Aug. 5, 2011); *Anadarko Petroleum Corp. v. Davis*, 2006 WL 3837518 at *27 (S.D.Tex.2006). Further, "[c]ourts agree that a willful or intentional destruction of evidence to prevent its use in litigation can justify severe sanctions." *Yelton,* at 393. The severity of a sanction for failing to preserve when a duty to do so has arisen must however be proportionate to the culpability involved and the prejudice that results. *Id.* In choosing the appropriate remedy, a court must ensure that it is "no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery." *Rimkus*, 688 F.Supp.2d at 618–19; *Duque v. Werner Enters., Inc.*, 2007 WL 998156 at *2–3 (S.D. Tex. 2007).

An appropriate sanction should therefore "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West v. Goodyear Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)).

Extreme sanctions—dismissal or default—have been upheld when "the spoliator's conduct was so egregious as to amount to a forfeiture of his claim" and "the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." *Yelton,* at 393; citing *Rimkus*, 688 F.Supp.2d at 618; (citing *Sampson v. City of Cambridge, Maryland*, 251 F.R.D. 172,

14

180 (D.Md.2008) (quoting *Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 593) (4th Cir. 2001)); *see Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir.2006) ("The prejudice inquiry 'looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.' ") (alteration in original) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir.1988)).

When a party is prejudiced, but not irreparably, from the loss of evidence that was destroyed with a high degree of culpability, a harsh but less extreme sanction than dismissal or default is to permit the fact finder to presume that the destroyed evidence was prejudicial. *Yelton,* 279 F.R.D. at 393, n. 79 (citing *FDIC v. Hurwitz,* 384 F.Supp.2d 1039, 1099-1100 (S.D.Tex. 2005)(internal citations omitted)).

An adverse inference instruction is an appropriate sanction which can be tailored based on the act, but are properly viewed as among the most severe sanctions a court can administer. *Id.* (*Rimkus*, 688 F.Supp.2d at 614 (citing *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)) (adverse inference jury instructions are available only upon a showing of bad faith conduct). *See also Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) ("[A] jury may draw an adverse inference 'that party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" (quoting *Russell v. Univ. of Tex. of the Permian Basin,* 234 Fed. Appx. 195, 207 (5th Cir. 2007)); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *see also United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000)).

Here, the Court finds that based on the record in this case, an adverse inference instruction is appropriate regarding the destruction of the email subfolder which Mader concedes contained his online communications regarding his marketing efforts as well as the emails which he claims were lost during the migration. Mader as the agent of PDS who communicated regarding the warranty agreement transaction clearly played a key role in the facts forming the basis of the claim. *See e.g., Sekisui Am.*

*Corp. v. Hart,* – F.Supp.2d –, 2013 WL 4116322 (S.D.N.Y. Aug. 15, 2013) (imposition of adverse inference jury instruction based on Plaintiffs' intentional destruction of ESI, including emails belonging to the former CEO of Plaintiffs' company and an employee who was responsible for compliance with FDA regulations, and whose communications would have played key role in establishing case); *Gatto v. United Air Lines, Inc.,* 2013 WL 1285285 (D.N.J. Mar. 25, 2013) (the Court imposed an adverse inference instruction for the intentional failure to preserve social media account information where Defendants were prejudiced by the absence of such information, even though Plaintiff may not have specifically intended to deprive Defendants of relevant evidence); *Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422, at *12 (M.D.Fla. Nov.7, 2006) (giving an adverse inference instruction after defendant permitted reformatting of hard drives after notice of possible litigation).

**IV.     Conclusion:**

Accordingly, **IT IS ORDERED** that Defendants, **Motion for Sanctions based on Spoliation of Evidence (R. Doc. 101)** is **GRANTED IN PART AND DENIED IN PART.**

**IT IS GRANTED IN PART** as to Defendants request for sanctions based on DSS' intentional destruction of the email subfolder and other emails which were discarded by DSS, with the exception of the email concerning the signed administration agreement.

**IT IS DENIED IN PART** as to Defendants request for sanctions regarding the discarding of the iPad and old computer because PDS has failed to present evidence of prejudice.

New Orleans, Louisiana, this 22nd day of November 2013.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**